IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **GREG J. KAMINSKI**, | CASE NO.    1:19-cv-01954 |
| Plaintiff, | |
| -vs- | JUDGE PAMELA A. BARKER |
| **CUYAHOGA COUNTY, et al.,** | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT CUYAHOGA COUNTY'S MOTION FOR SUMMARY JUDGMENT**

Sarah Gelsomino (0084340)
Marcus Sidoti (0077476)
FRIEDMAN, GILBERT + GERHARDSTEIN
50 Public Square, Suite 1900
Cleveland, OH 44113-2205
T: 216-241-1430
F: 216-621-0427
sarah@FGGfirm.com
marcus@FGGfirm.com

Jacqueline Greene (0092733)
M. Caroline Hyatt (0093323)
FRIEDMAN, GILBERT + GERHARDSTEIN
441 Vine Street, Suite 3400
Cincinnati, Ohio 45202
T: 513-572-4200
F: 216-621-0427
jacqueline@FGGfirm.com
caroline@FGGfirm.com

*Counsel for Plaintiff*

Dated: August 17, 2021

BRIAN KRAIG, ESQ. (0039691)
KEVIN V. ROGERS, JR. (0084994)
OF: KRAIG & KRAIG
The Superior Building 19th Floor
815 Superior Avenue East, Suite 1920
Cleveland, Ohio 44114
(216) 696-4009 phone
(216) 696-1835 fax
kraigandkraig@gmail.com
kvrlaw@gmail.com

*Counsel for Plaintiff*

i

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 1

LAW AND ARGUMENT ............................................................................................... 11

    I.    Summary Judgment Standard .......................................................................... 11

    II.    Plaintiff's Constitutional Claims Against Defendant Cuyahoga County Must Proceed to Trial Because the Violation of Greg Kaminski's Constitutional Rights Was Caused by Defendant County's Policies and Practices ........................................................................... 12

        A.    The Policies and Practices of Cuyahoga County Caused the Constitutional Violations ................................................................................................................. 13

        B.    The Individual Defendants' Use of Excessive Force was Caused by Defendant Cuyahoga County's Pattern of Ratifying Uses of Excessive Force ...................................... 16

        C.    Defendant Cuyahoga County Tolerated and Acquiesced in the Use of Excessive Force ......................................................................................................................... 18

        D.    Inadequate Training and Supervision Caused the Individual Defendants to Use Excessive Force Against Greg Kaminski .......................................................................... 22

CONCLUSION ............................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*,
  398 U.S. 144 (1970)…………………………………………………………………...13

*Alphabet v. City of Cleveland*,
  No. 1:05-cv-1792, 2006 WL 3241785 (N.D. Ohio Nov. 7 2006)……………...………19

*Anderson v. Liberty Lobby Inc.*,
  477 U.S. 242 (1986)……………………………………………………………..………11
  .

*Arendale v. City of Memphis*,
  519 F.3d 587 (6th Cir. 2008)…………………………………………………………18

*Bell v. Wolfish*,
  441 U.S. 520 (1979)………………………………………………………...………………14

*Blackmon v. Sutton,*
  734 F.3d 1237 (10th Cir. 2012)……………………………...……………………..14

*Brown v. Shaner,*
  172 F.3d 927 (6th Cir. 1999)……………………………………………………………22

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)…………………………………………………………………...11

*City of Canton v. Harris,*
  489 U.S. 378 (1989)……………………………………………………………12, 22

*City of St. Louis v. Praprotnik,*
  485 U.S. 112 (1988)………………………………………………………………...16

*Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.*,
  455 F.3d 690 (6th Cir. 2006)……………………………………………………22

*Fletcher v. Vandyne*,
  No. 2:07–CV–325, 2009 WL 1687956 (S.D. Ohio June 11, 2009)……………………...14

*Garner v. Memphis Police Dep't,*
  8 F.3d 358 (6th Cir. 1993)……………………………………………………………12

*Graham v. Connor,*
  490 U.S. 386 (1989)……………………………………………………………………..23

*Hernandez v. Borough of Palisades Park Police Dept.*,
58 F.App'x 909 (3d Cir. 2003)…………………………………………………..20

*Jackson v. City of Cleveland,*
925 F.3d 793 (6th Cir. 2019)……………………………………………12, 13, 22

*Leach v. Shelby Cty. Sheriff,*
891 F.2d 1241 (6th Cir. 1989)……………………………………………17, 19

*Marchese v. Lucas*,
758 F.2d 181 (6th Cir. 1985)……………………………………………………21

*Matulin v. Village of Lodi*,
862 F.2d 609 (6th Cir. 1988)……………………………………………………24

*Meirs v. Ottawa County*,
821 F.App'x 445 (6th Cir. 2020)……………………………………………...21

*Monell v. Dept. of Social Serv.,*
436 U.S. 658 (1978)……………………………………………………12, 13, 14

*North v. Cuyahoga County,*
754 F.App'x 380 (6th Cir. 2018)……………………………………………...12

*Oklahoma v. Tuttle,*
471 U.S. 808 (1985)……………………………………………………………...24

*Paige v. Coyner,*
614 F.3d 273 (6th Cir. 2010)……………………………………………………13

*Pineda v. City of Houston*,
291 F.3d 325 (5th Cir. 2002)……………………………………………………19

*Powers v. Hamilton Cnty. Public Defender,*
501 F.3d 592 (6th Cir. 2007)……………………………………………………24

*Thomas v. City of Chattanooga*,
398 F.3d 426 (6th Cir. 2005)……………………………………………………18

*Wright v. City of Euclid*,
962 F.3d 852 (6th Cir. 2020)……………………………………………...17, 23

**Statutes and Rules**

Fed. R. Civ. P. 56(c)……………………………………………………………..11

42 U.S.C. § 1983…………………………………………………………12, 13, 18

iv

## INTRODUCTION

At the Cuyahoga County Corrections Center ("CCCC"), the Special Response Team ("SRT") operates as a band of thugs, using force with impunity against those detained at the CCCC. On July 29, 2018, Plaintiff Greg Kaminski became the subject of their ire. Defendant SRT officers Jecubic and Barthany pepper sprayed and brutally beaten him until he lost consciousness, suffering severe injury. Despite the fact that he was not resisting, noncompliant, or posing any threat whatsoever, he was then placed in a restraint chair by Defendant SRT officers Jecubic and King, "decontaminated," and left in the restraint chair for an hour by Defendant Griffin. These uses of force were unprovoked, unnecessary, and unconstitutional. Because these constitutional violations were consistent with, and the result of, Cuyahoga County policies and customs, Defendant Cuyahoga County is liable for those violations and summary judgment must be denied.

## STATEMENT OF FACTS

In 2018, the Cuyahoga County Corrections Center ("CCCC"), was in a state of disaster. Following multiple unexplained deaths at the jail, the United States Marshals Service completed a comprehensive and damning overview of the operations of the CCCC, rating the facility "Unsatisfactory/At-Risk." (Doc. 22-2, Marshals Report, PageID#166). During the three-day visit, a team of subject matter experts toured the facilities and observed operations of all CCCC facilities, reviewed policies, procedures, and supporting documentation, and conducted interviews with staff, contractors, and over 200 detainees and inmates. (*Id*.). Their review found non-compliance in *all* functional areas. (*Id*.).

The Marshals Service found significant concerns with the Special Response Team ("SRT"). SRT is a paramilitary organization within the CCC that is called when the corrections officers need "protection" and "extra security." (Doc. 68-1, Griffin, PageID#1872; P 1, Huseman,

p. 38). The SRT members, identified by their black uniforms, refer to themselves as "The Men in Black," (P 2, O'Meara, p. 62), in apparent reference to their uniforms, but also invoking the notion of black-clad government agents operating outside of official channels and outside of the law. Inmates at the CCCC have also referred to them as "Some Real Thugs." (P 2, O'Meara, p. 61). The Marshals' review found that 100% of the more than 200 inmates interviewed feared retaliation by SRT. (Doc. 22-2, Marshals Report, PageID#166). These interviews revealed strong and consistent allegations of brutality by the SRT. (*Id.*, PageID#198). These reports were corroborated by the personal observations of the review team members, who observed SRT members "verbally abusing and demonstrating aggressive behavior towards detainees/inmates" and found "aggressive conduct and behavior as well as abusive, explicit language used by SRT members direct at detainees/inmates" captured on body-cam video. (*Id.*). While one staff member who had read the report was unable to identify any specific dispute he had with the underlying facts in the report, he disputed the report's characterization of the CCCC as "inhumane," because "[i]f it was inhumane, it would be shut down." (P 3, Tyler, p. 87).

While this report is deeply disturbing on its own, the conduct documented in the report is the conduct that CCCC corrections officers were comfortable performing openly, in front of the review team. When not under scrutiny, the retaliatory abuse suffered by detainees at the hands of the SRT is even worse. When SRT is called, they know that they are being called for the purpose of using force. It is not their last choice, but their first.

This pattern of dangerous and abusive conduct by SRT officers and other staff at the CCCC is not only unconstitutional, leading to a lengthy series of lawsuits by detainees, but has also resulted in criminal charges against CCCC officers and administration, many of which resulted in guilty pleas. These incidents reveal a pattern of retaliatory assault, of close-range OC exposure,

punitive use of the restraint chair, and the cover-up of misconduct by everyone from individual corrections officers to Warden Ivey himself.[1] This includes, but is not limited to:

- November 27, 2017: Chariell Glaze was **pepper sprayed at close range, then placed in restraint chair for three hours by SRT officers, in retaliation** for asking about her release. *Glaze v. Cuyahoga County, et al*., No. 1:19-cv-2969 (USDC N.D. Ohio).
- February 5, 2018: Joshua Castleberry was assaulted by an officer after he complained about a stale bologna sandwich. The officer **pepper sprayed him in the face and smashed Joshua's face into the floor,** knocking out two teeth and lodging a third in his nasal cavity. He was then put in a **restraint chair** instead of being given medical treatment. *Castleberry v. Cuyahoga County, et al*., 1:20-cv-218 (USDC N.D. Ohio). Criminal charges were brought against John Wilson and Jason Jozwiak for felonious assault, interfering with civil rights, and falsification. **Wilson ultimately pled guilty to assault.** *Ohio v. John Wilson,* No. CR-19-639160-B, Cuyahoga County Ct. Com. Pl. Jozwiak was eventually found not guilty. *Ohio vs. Jason A. Jozwiak*, No. CR-19-639160-A, Cuyahoga County Ct. Com. Pl.
- April 4, 2018: Michael Roarty-Nugent had **SRT** called on him because an officer believed he disrespected her. He was **handcuffed, assaulted, and his face was slammed into the floor;** once he was on the floor he was kicked and **pepper sprayed**, before being placed in a **restraint chair**. *Roarty-Nugent v. Cuyahoga County, et al.*, No. 1:20-cv-1025 (USDC N.D. Ohio).
- May 6, 2018: De'Von Bean was **attacked by SRT officers** who punched him, **pepper sprayed** him, and knocked him unconscious. *Bean v. Cuyahoga County, et al*., No. 1:19-cv-01000 (USDC N.D. Ohio).
- July 8, 2018: Cortez Tyree was **assaulted by SRT** because he wouldn't get off the phone; they punched, kicked, and **pepper sprayed** him on the ground, then put in a **restraint chair**. He was attacked again on the **elevator**, while still restrained. *Cortez Tyree v. Cuyahoga County, et al*., No. 1-19-cv-1533 (USDC N.D. Ohio).
- July 16, 2018: Chantelle Glass was **assaulted, pepper sprayed, and put in a restraint chair** for asking for a phone call. *Chantelle Glass v. Idris-Farid Clark, et al*., No. 1:20-cv-2041 (USDC N.D. Ohio). **Idris-Farid Clark pled guilty to felonious assault and unlawful restraint. Robert Marsh pled guilty to assault as well as extortion**, related to his efforts to blackmail other corrections officers into testifying on his behalf by threatening them with the release of video of them abusing inmates. *Ohio v. Robert P. Marsh*, No. CR-19-638832-B, Cuyahoga County Ct. Com. Pl.; *Ohio v. Idris-Farid Clark*, CR-19-638832-A, CR-19-643484-A, CR-19-643485-A, CR-19-645264-A, Cuyahoga County Ct. Com. Pl.
- August 27, 2018: Grant Grier was slammed against the wall and choked after complaining about pain from his arrest. *Grant Grier v. Cuyahoga County, et al*., No. 1:20-cv-1919 (USDC N.D. Ohio).
- August 28, 2018: Joseph Arquillo died of a drug overdose while at the CCCC, after officers ignored him for hours. *Arquillo v. Cuyahoga County, et al.,* No. 1:20-cv-

---

[1] Warden Ivey actually got his start as an SRT officer. (P 1, Huseman, p. 43).

01201 (USDC N.D. Ohio). Officer Martin Devring, who walked up to him, kicked the mat he was on, and then walked away, pled guilty to charges of dereliction of duty and tampering with records. *Ohio v. Martin Devring*, No. CR-19-638833-A, Cuyahoga County Ct. Com. Pl. **Warden Ivey pled guilty to charges of obstructing justice after he ordered investigators to turn off their body cameras.** *Ohio v. Eric Ivey*, No. CR-19-639159-A, Cuyahoga County Ct. Com. Pl.

- September 16, 2018: Corrionne Lawrence was **placed in a restraint chair** for speaking in Spanish, and later handcuffed and **beaten in an elevator, where there was no camera,** after one of the officers turned off his body camera. *Lawrence v. Cuyahoga County*, No. 1:19-cv-024 (USDC N.D. Ohio).

- October 16, 2018: Glenn Mayer was suffering from involuntary muscle twitches and an officer put in a chokehold and elbowed him. When his condition was explained to the officer, he responded "I'm not used to this, I'm used to choking people out when things like this happen." *Mayer v. Cuyahoga County, et al*., No. 1:19-cv-2620 (USDC N.D. Ohio).

- November 3, 2018: Tyron Hipps was **assaulted** while praying **in retaliation** for speaking to the US Marshals. *Tyrone Hipps Jr. v. Cuyahoga County, et al*., No. 1:19-cv-2815 (USDC N.D. Ohio).

- November 12, 2018: Jasper Muldrow was **assaulted, put in a chokehold, and pepper sprayed by multiple officers** after an officer started arguing with him while he was singing. *Muldrow v. Cuyahoga County, et al*., 1:20-cv-2539 (USDC N.D. Ohio). Charles Enoch pled guilty to assault. *Ohio v. Charles Enoch*, No. CR-20-653239-A, Cuyahoga County Ct. Com. Pl.

- December 22, 2018: Lorinzo Sampson was **assaulted, pepper sprayed, and put in the restraint chair by SRT officers** after he asked to speak with an officer's supervisor on the belief that he was being racially profiled. *Sampson v. City of Cleveland, et al*., No. 1:20-cv-741 (USDC N.D. Ohio).

- March 22, 2019: Terrence Debose, who was mentally ill, was **put in a restraint chair and beaten in the chair after officers turned off their body cameras**. *Debose v. Cuyahoga County, et al*., No. 1:20-cv-727 (USDC N.D. Ohio). **Nicholas Evans pled guilty to attempted felonious assault and tampering with evidence** and received nine months in prison. *Ohio v. Nicholas D. Evans*, No. CR-19-638834-A, Cuyahoga County Ct. Com. Pl. **Timothy Dugan pled guilty to attempted abduction and misdemeanor assault.** Dugan received ten days. *Ohio v. Timothy M. Dugan*, No. CR-19-638834-B, Cuyahoga County Ct. Com. Pl.

Plaintiff Greg Kaminski experienced this brutality himself after he was arrested and booked into the CCCC on July 29, 2018. (Doc. 54, Kaminski, PageID#1294-1295). While he was being booked, a booking officer made a "1019" call for an unruly inmate, and SRT responded. (Doc. 68-1, Griffin, PageID#1881-1882). The SRT officers who responded took him to an elevator, where there was no camera. (P 1, Huseman, p. 90; Doc. 50, Jecubic, PageID#653-654; Doc. 51, Barthany, PageID#801). Then he was pepper sprayed and beaten until he lost consciousness. (Doc. 54,

Kaminski, PageID#1316-1329). These uses of force were completely unprovoked, unnecessary, unconstitutional, and made pursuant to Defendant Cuyahoga County's SRT and use of force policies. Plaintiff's law enforcement and corrections expert opined that the force used by Defendants Jecubic and Barthany was unreasonable, unnecessary, and disproportional by generally accepted correctional use of force practices, and that Jecubic and Barthany violated Ohio jail standards, American Correctional Association standard, and generally accepted jail practices. (Doc. 68-2, Raney Report, PageID#2004-2005).

Afterwards, Kaminski was put in a restraint chair, "decontaminated," and held in the restraint chair for an hour. While justified with flimsy references to inmate safety, this decontamination process is tantamount to torture. Every time an individual is sprayed with OC spray, they are put in a restraint chair to be "decontaminated." (Doc. 50, Jecubic, PageID#685). The American Correctional Association says that restraint chairs should only be used to prevent self-injury, injury to others, or property damage, and that they are not to be applied for more time than is necessary. See Doc. 68-2, Raney Report, PageID#2006, citing American Correctional Association Performance-Based Standards for Adult Local Detention Facilities, Fourth Edition. Standard 4-ALDF-2B-01 & 02. p. 32. However, the policy of the CCCC is to use the restraint chair *solely on the basis of OC exposure,* and *regardless of behavior.* (Doc. 50, Jecubic, PageID#685, 688; Doc. 48, King, PageID#371; Doc. 53, Muhammad, PageID#1230-1231, 1233; Doc. 68-1, Griffin, PageID#1908; Doc. 52, Kelley, PageID#977). It was solely on the basis of this unwritten but well-settled policy and practice that Kaminski was placed in a restraint chair. (Doc. 50, Jecubic, PageID#804). The use of the restraint chair in this circumstance was unnecessary and unreasonable, and did not comply with Ohio jail standards, American Correctional standards, and generally accepted correctional practices. (Doc. 68-2, Raney Report, PageID#2005).

After being restrained, the inmate then has water dumped over their head. The position of the restraint chair, slightly reclined, makes it impossible to breathe as water rushes down their face. If they do try to breathe, the OC spray will get into their mouth and nose, causing further, and unnecessary, irritation. As the water falls, it brings the excess OC spray to other parts of their body as well, and along with it, the severe burning sensation of the OC spray. This includes a burning sensation in the lap and genital area. (P 1, Huseman, p. 73).

During decontamination, an officer reads the "OC Administrative Warning." (Doc. 68-3, Griffin Ex. 19, PageID#2028). However, the OC warning is not a warning, but rather a serious of questions to answer. (*Id*.). Answering these questions, while the water is being dumped over their heads, ensures maximum pain and discomfort, as the inmates get OC spray in their mouths and choke and sputter as they try to breathe and speak through the water. See P 1, Huseman, p. 72 (describing how detainees are asked these questions during the decontamination, not prior to). There is simply no penological, safety, or medical basis for waterboarding detainees during OC decontamination.

After decontamination, they are taken to the restraint room, where they are left and monitored for at least an hour, while still restrained. (Doc. 50, Jecubic, PageID#687). While this is ostensibly to ensure that they do not have a reaction to the OC spray, (*Id*., PageID#685), there is no penological, safety, or medical basis for compliant persons to remain in the restraint chair during this monitoring period. The County admits that it is not necessary to restrain someone to monitor them. (Doc. 53, Muhammad, PageID#1234).

The use of force against Kaminski was not captured by any of the cameras in the CCCC nor by body cameras because there were no cameras in the elevators in 2018. (P 1, Huseman, p. 90). There is no camera in the dress-in area either, where the Defendants claim the use of force

took place. (Doc 68-1, Griffin, PageID#1950-1951). At the time of the incident, there was only one body camera to be used by SRT. (P 2, O'Meara, p. 21-22). However, the officer wearing the body camera that day, SRT officer Spirakus, did not respond to the 1019 or the 1025 calls and as a result was not present to record the Defendants' uses of force on Kaminski, in violation of the policy that all SRT officers respond. While it is possible to have multiple calls simultaneously that require responses from SRT, there is no evidence that Spirakus was responding to any other calls at the time. (P 4, Griffin Ex. 20 – Jail Tour of Duty Report). He simply—and conveniently for the Defendants—chose not to show up. This is consistent with a pattern of conduct at the CCCC to avoid recording incidents. This includes choosing to use force in the elevator, where there is no camera, and turning off body cameras (including at the direct order of Warden Ivey). See Statement of Facts, pp. 3-4.

Following the use of force, Defendants Jecubic, Barthany, Griffin, and King completed combination reports with their narratives of the incident. While generally accepted correctional practices requires detailed documentation of uses of force, including the lead up to the use of force, triggering events, statements and commands made before and during the use of force, specific force techniques, and any injuries that resulting, including to the officer and the subject of the use of force, the reports submitted were "vastly substandard." (Doc. 68-2, Raney Report, PageID#2007). Jecubic's report was vague and misleading, describing the force he used, wherein he slammed Kaminski's face into the floor so hard that his orbital bone was fractured, as merely "direct[ing] him to the floor by taking hold of his left arm." (*Id.*; Doc. 50-4, Jecubic Combination Report, PageID#720). The report not only omits that Kaminski hit the ground at all, but also omits that he was injured. (*Id.*) Barthany's report is almost identical. (Doc. 51-4, Barthany Combination Report, PageID#868). King's report does not explain why he placed Kaminski in the restraint chair

7

or describe in any way the scene he observed upon arrival. (Doc. 48-6, King Combination Report, PageID#415). In fact, none of the reports include any reference to the fact that Kaminski was injured, despite the fact that Jecubic and Griffin admit that they knew Kaminski was injured at the time. (Doc. 50, Jecubic, PageID#693; Doc. 68-1, Griffin, PageID#1942-1943). Gary Raney describes Defendant Corporal Griffin's admission that he knowingly and voluntarily omitted all reference to Kaminski's injuries as "shocking." (Doc. 68-2, Raney Report, PageID#2008). He not only omitted any reference to the visible laceration, bleeding, and swelling of Kaminski's face, but as supervisor, he reviewed the reports of Jecubic, Barthany, and King, and failed to ensure that any of them included such necessary and pertinent information. (*Id*.). Raney opined that such a significant failure was a serious violation of generally accepted correctional practices that it, at a minimum, should have led to personnel actions against Jecubic, Barthany, and Griffin. (*Id*.).

However, astonishingly, the evidence demonstrates that omitting all information about injuries suffered as a result of the use of force is the *trained policy* of Defendant Cuyahoga County. (Doc. 53, Muhammad, PageID#1196, 1201). This policy demonstrates not only that the involved officers sought to avoid detection and investigation of their unreasonable use of force against Kaminski, (Doc. 68-2, Raney Report, PageID#2009), but that Defendant Cuyahoga County itself actively sought to avoid detection, investigation, or knowledge of excessive uses of force engaged in by its officers.

While the sanitized and incomplete reports of the involved officers were unlikely to raise any flags that the force had been excessive, and there was no video capturing the incident, Kaminski himself reported the excessive use of force to jail investigator officer Terron Lewis. However, despite the blatant misrepresentation by Defendant Cuyahoga County of Lewis' involvement—claiming in its motion that Lewis had conducted an investigation into the use of

8

force by the individual Defendants—Lewis explained that "I only investigate inmates. I don't investigate the officers." (Doc. 56, T. Lewis, PageID#1620). What Lewis *was* doing was investigating whether Kaminski had violated any rules at the jail. And as a result of that investigation—and despite Kaminski's report that he never grabbed Jecubic and that Jecubic and Barthany assaulted him—Warden Ivey disciplined Kaminski, giving him five days in disciplinary housing. (*Id.*, PageID#1598-1599, 1613-1614). However, while Lewis was not responsible for investigating the use of force, and therefore did not do so, he did pass the information about Kaminski's allegations to Sergeant Thevenin and Warden Ivey, expecting that they would look into it. (*Id.*, PageID#1599, 1601).

However, despite being alerted to Kaminski's allegations, neither Warden Ivey, nor any other jail official, ever conducted any investigation into the uses of force by the individual Defendants. Jecubic, Barthany, Griffin, and King were never interviewed about the incident. (Doc. 56, T. Lewis, PageID#1602; Doc. 50, Jecubic, PageID#692). There was never any disciplinary process undertaken for Jecubic, King, or Griffin. (P 5, C. Lewis, pp. 70, 73). While Barthany has received discipline for the excessive use of pepper spray, it was not for this incident. (Doc. 51, Barthany, PageID#777, 782; Doc. 51-3, Barthany Suspension, PageID#865-867). None of them were disciplined. (Doc. 51, Barthany, PageID#777; Doc. 48, King, PageID#345; Doc. 50, Jecubic, PageID#631; Doc. 68-1, Griffin, PageID#1884). The failure to investigate this use of force violated Ohio jail standards and generally accepted correctional practices. (Doc. 68-2, Raney Report, PageID#2009).

Ultimately, however, the failure to investigate these uses of force by the individual Defendants demonstrates that they were in compliance with the actual policies and practices of Defendant Cuyahoga County. This is particularly explicit in regard to the use of the restraint chair

by Defendants Jecubic, Griffin, and King. As explained by Defendant Jecubic, Kaminski was placed in the restraint chair, despite being complaint, as a result of CCCC policy. (Doc. 50, Jecubic, PageID#804). However, the initial excessive force by Jecubic and Barthany when they assaulted Kaminski in the elevator, where there would be no video captured of the incident, breaking his orbital bone and pepper spraying him in the eyes, in apparent retaliation for using racial slurs against Defendant Barthany, was also consistent with Cuyahoga County policy. The use of retaliatory and excessive force, the use of pepper spray at close range, and the deliberate choice of the elevator so that their misconduct would not be captured on video, are all consistent with the established practice of the use of force by CCCC corrections officers, and SRT members in particular.

In fact, the training provided to corrections officers at CCCC is disturbingly deficient. After officers become OPOTA certified, they are not required to undergo any additional or continuing use of force training. (Doc. 53, Muhammad, PageID#1150, 1176). When officers are promoted or become SRT members, they receive one-time additional tactical training, but nothing further. (*Id.*; Doc. 52, Kelley, PageID#927).

In addition to the limited amount of training officers receive at the CCCC, the training they receive is itself inadequate. There is no testing of any form to ensure that officers understand the training they have received. (Doc. 53, Muhammad, PageID#1174). While the use of force training includes a discussion of *Graham v. Connor*, the Supreme Court of the United States case that established the standard for evaluating the reasonable use of force that applies to force used during arrests and force used on pretrial detainees, the instruction they receive is that a use of force "can't be [judged] with the 20/20 hindsight" and you "have to look into the officer's eyes, because the officers make a split-second decision." (Doc. 53, Muhammad, PageID#1143). While this is not

inaccurate, it is incomplete. The instruction on *Graham v. Connor* does not include an explanation that the standard is objective, and based on an objective, reasonable officer. (*Id.*, PageID#1143-1145). Without explaining that the standard is an objective one, and only including the instruction to "look into the officer's eyes" and not use "hindsight," the CCCC training officers receive is likely to make an officer think that the standard was actually subjective and that if they feel justified in the moment, that their use of force cannot be reviewed after the fact and that it will be found to be reasonable.

Alarmingly, the instruction provided at CCCC is subject to no oversight whatsoever. While the warden is ostensibly in charge of approving training, the only thing he receives prior to training is the schedule. (Doc. 52, Kelley, PageID#955, 957). The instructors are not required to turn in a lesson plan or any written materials and receive no guidance on what to cover. (*Id.*, PageID#952; Doc. 53, Muhammad, PageID#1156). There is no evaluation of the classes or the instructors. (Doc. 53, Muhammad, PageID#1160). Defendant Cuyahoga County has not taken any action to ensure that the use of force training is in compliance with Ohio standards, and even after the release of the report from the US Marshals, there has been no discussion of reviewing or rewriting the use of force policy, nor any retraining, and no effort made whatsoever to address the issues raised by the report. (*Id.*, PageID#1220-1221). This lack of adequate training fails to meet generally accepted correctional practices. (Doc. 68-2, Raney Report, PageID#2013).

## LAW AND ARGUMENT

### I. Summary Judgment Standard

Summary judgment is appropriate only when the evidence shows no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant bears the initial burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court must view evidence in a light most favorable to Plaintiff and draw all reasonable

inferences in his favor. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986). "Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

facts are jury functions, not those of a judge." *Id.* at 255.

**II.      Plaintiff's Constitutional Claims Against Defendant Cuyahoga County Must**
         **Proceed to Trial Because the Violation of Greg Kaminski's Constitutional Rights**
         **Was Caused by Defendant County's Policies and Practices**

         To establish municipal liability under 42 U.S.C. § 1983 and *Monell v. Dept. of Social Serv.*,

436 U.S. 658 (1978), Plaintiff must show that Defendant Cuyahoga County's policy, custom, or

procedure was the moving force behind the constitutional violation. *City of Canton v. Harris*, 489

U.S. 378 (1989). This does require an underlying constitutional violation, however Plaintiff can

prevail on his *Monell* claim independent of whether the individual Defendants are granted qualified

immunity. *Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993).[2]

         There are four general methods of proving a municipality's illegal policy or custom: the

plaintiff may prove "(1) the existence of an illegal official policy or legislative enactment; (2) that

an official with final decision making authority ratified illegal actions; (3) the existence of a policy

of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence

of federal rights violations." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (citing

*Burgess*, 735 F.3d at 478). The first two methods of demonstrating municipal liability are based

on city policy itself being unconstitutional. The latter two are based on a failure to act that is

deliberately indifferent to the rights of persons who come into contact with County officials. See

*North v. Cuyahoga County*, 754 F.App'x 380, 384 fn. 2 (6th Cir. 2018), citing *Garner v*, 8 F.3d at

365-366 (noting that the deliberate indifference test is used to analyze failure-to-train claims but

not affirmative policy or custom claims). Here, all four methods of imposing municipal liability

---

[2] For all the reasons explained in Plaintiff's Memorandum in Response to Defendant Jecubic, Barthany, King, and Griffin's Motions for Summary Judgment, the individual Defendants did commit underlying violations of Mr. Kaminski's constitutional rights. (Doc. 68).

apply. Defendant Cuyahoga County's motion for summary judgment, which provides only the briefest of defenses, barely more than a perfunctory listing of the elements of *Monell* claims, must be denied.

### A.  The Policies and Practices of Cuyahoga County Caused the Constitutional Violations

"[T]o satisfy the *Monell* requirements a plaintiff must identify the policy, connect the policy to the city itself, and show that the particular injury was incurred because of the execution of that policy." *Jackson*, 925 F.3d at 829 (internal quotation omitted). However, a municipality "may be liable under *Monell* for a policy of permitting constitutional violations regardless of whether the policy is written." *Id*. at 830. "[C]ustoms, in contrast to official policies, do not receive 'formal approval,'" and instead are "'persistent and widespread . . . practices of . . . officials.'" *Monell*, 436 U.S. at 690-691; *Paige v. Coyner*, 614 F.3d 273, 284 (6th Cir. 2010). "[P]olicy or custom does not have to be written law; it can be created 'by those whose edicts or acts may fairly be said to represent official policy.'" *Id*. "Congress included customs and usages" in 1983 because "[a]lthough not authorized by written law, such practices ... could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691, quoting *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 167–68 (1970).

Defendant Cuyahoga County, notably, does not move to dismiss Plaintiff's claims that the County has unconstitutional policies and customs. While the County does argue (briefly, and unconvincingly) that liability cannot be imposed against Defendant County on the basis that the County failed to train and supervise its officers, that the County had a custom of tolerance or acquiesced in the violations, and that the County did not ratify unconstitutional conduct, it makes no argument that the County did not have unconstitutional policies. (Doc. 59, County Motion for Summary Judgment, PageID#1712-1714). Because the Defendant County has not moved for

13

summary judgment on that claim,[3] summary judgment cannot be granted on that claim. However, it is clear that this is not a mere error of omission, but the natural result of clear and material disputes of fact regarding whether Defendant Cuyahoga County has a policy that caused the constitutional violations that Mr. Kaminski suffered.

Unconstitutional Restraint Chair Policy

While unwritten, it is the official policy of Defendant Cuyahoga County to restrain detainees in the restraint chair, *regardless of their behavior,* when they have been exposed to OC spray. (Doc. 50, Jecubic, PageID#685, 688; Doc. 48, King, PageID#371; Doc. 53, Muhammad, PageID#1230-1231, 1233; Doc. 68-1, Griffin, PageID#1908; Doc. 52, Kelley, PageID#977). They are then kept in the restraint chair for at least an hour for "observation," again, regardless of their behavior. (Doc. 50, Jecubic, PageID#687; Doc. 54, Muhammad, PageID#1234). This policy is patently unconstitutional, because the use of the restraint chair without penological justification is unconstitutionally excessive. *Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2012), citing *Bell v. Wolfish*, 441 U.S. 520, 538 (1979); *Fletcher v. Vandyne*, No. 2:07–CV–325, 2009 WL 1687956, *14 (S.D. Ohio June 11, 2009). There is no penological justification to use the restraint chair on a compliant detainee and Mr. Kaminski was restrained in the restraint chair and kept there for an hour, despite being compliant the entire time. While the County justifies this policy as necessary to monitoring detainees following OC exposure, Defendant County admits that it is not necessary to keep a compliant detainee restrained to monitor them. (Doc. 54, Muhammad, PageID#1234).

Mr. Kaminski was placed in the restraint chair not because he posed a threat to himself or others, or was resistant in any way, but because it was the policy of Defendant Cuyahoga County

---

[3] This claim was raised in Plaintiff's complaint. (Doc. 22, Complaint, PageID#155-156, P 68(b), (e), (h)).

to do so. (Doc. 50, Jecubic, PageID#685). Because this constitutional violation was caused by Defendant County's policy, the County is liable under *Monell* for that violation.

<u>Unconstitutional Use of Force Policy</u>

Defendant Cuyahoga County also has an unconstitutional use of force policy. It is the policy of Defendant County that SRT is called to use force, and so they will use force regardless of whether it is objectively reasonable to do so. Although not written, this policy is so well-settled as to have the force of law. Corrections officers assigned to SRT operate with a presumption that they engage in the use of force when called to respond to prisoners without objective observations justifying the use of force. See, e.g., P 6, Clements, pp. 106-110, 113. (Stating that when called to a pod regarding a prisoner who refused to get off the phone, and who was sitting on the floor when he arrived merely talking on the phone, that he did not stop and talk to the other officers present in the pod when he arrived and only asked where the prisoner in question was located, that he knows what is going on without being in the room, and that the officers' position 20-30 feet away was alone sufficient to justify immediately approaching the prisoner and using force.)

This well-settled policy and practice of Defendant Cuyahoga County is clearly seen through the pattern of force used by its officers on detainees throughout 2018, both before and after the use of gratuitous force against Mr. Kaminski. See Statement of Facts, pp. 3-4. These are not merely the actions of a couple of bad actors, in violation of County policy. Rather, they are demonstrative of a widespread and well-settled custom. In addition to these specific incidents, this pattern is consistent with the findings of the Marshals Service in its report on the CCCC. (Doc. 22-2, Marshals Report, PageID#166, 198).

Defendants Jecubic and Barthany acted consistently with the County customs regarding use of force when they assaulted Mr. Kaminski without adequate justification. Because Defendants

15

Jecubic and Barthany used excessive force as a result of County policy, Defendant Cuyahoga County is liable for causing the constitutional violations Mr. Kaminski suffered, and summary judgment must be denied.

**B.  The Individual Defendants' Use of Excessive Force was Caused by Defendant Cuyahoga County's Pattern of Ratifying Uses of Excessive Force**

In *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988), the court explained how a decision by the final policy maker reviewing a single incident of alleged misconduct can bind a municipality: When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final. *Id*. at 127 (emphasis added).

In other words, when the final municipal policymaker reviews the employee's discretionary actions, he measures those actions against the municipality's official policies. If he approves the employee's actions and does not discipline or reprimand the employee, his approval is final and demonstrates that the employee followed official policy. In a ratification case, therefore, the municipality's liability is not based on the policymaker's *ex post facto* approval of the employee's actions. Rather, it is based on the municipality's own policy, which the employee followed in carrying out his actions. The official's ratification merely confirms that the employee was acting according to official policy.

As described above in Section II(A), Defendant Cuyahoga County has an unconstitutional use of force policy. And when the conduct of Defendants Jecubic and Barthany was measured

16

against that policy, they were found to be in compliance with it. Mr. Kaminski's complaint that Defendants Jecubic and Barthany used excessive force against him – specifically that he never grabbed Jecubic and that Jecubic and Barthany assaulted him – was brought to the attention of Warden Ivey. (Doc. 56, T. Lewis, PageID#1599, 1601). However, because this completely gratuitous and retaliatory use of force was consistent with Defendant County's policies, Warden Ivey did not conduct an investigation, much less discipline the officers involved. See Statement of Facts, p. 9. A plaintiff can establish municipal liability by showing that the municipality ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct. *Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020); *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989) (holding that the sheriff's failure to investigate mistreatment and punish those involved "ratified the unconstitutional acts"). Defendant County's only argument that it is not liable based on ratification is based on the incredulous statement that there was an investigation conducted into the uses of force Kaminski suffered, because it was investigated by Investigator Lewis. (Doc. 59, County Motion for Summary Judgment, PageID#1715). This completely misstates the facts. Terron Lewis investigated *Kaminski* for a rule violation, not the officers. He testified unambiguously that he "only investigate[s] inmates. I don't investigate the officers." (Doc. 56, T. Lewis, PageID#1620).

The failure of Warden Ivey, who has been found personally guilty of obstructing justice after he ordered officers to turn off their body cameras to cover up officer misconduct, to conduct an investigation when allegations of unconstitutional conduct have been made, is consistent with the County's policy of allowing excessive force and imposes liability on Defendant County. See *Ohio v. Eric Ivey*, No. CR-19-639159-A, Cuyahoga County Ct. Com. Pl. For this reason, summary judgment must be denied.

17

### C.  Defendant Cuyahoga County Tolerated and Acquiesced in the Use of Excessive Force

Defendant Cuyahoga County also tolerated a pattern of excessive force by its officers, which caused the individual Defendants' uses of deadly force against Greg Kaminski. When a municipality has a custom of inaction to constitutional violations, it is shown by "(1) the existence of a clear and persistent pattern of [violations under §1983] by municipal employees, (2) notice or constructive notice on the part of the [County]; (3) the [County's] tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) that the [County's] custom was the "moving force" or direct causal link in the constitutional deprivation." *Arendale v. City of Memphis*, 519 F.3d 587, 599-600 (6th Cir. 2008). This same standard is used to evaluate the adequacy of investigations. See *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005) (The plaintiffs "must show not only that the investigation was inadequate, but that the flaws in this particular investigation were representative of (1) a clear and persistent pattern of illegal activity, (2) which the Department knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the Department's custom was the cause of the [unconstitutional activity].").

Defendant County moved for summary judgment on this claim based on the argument that one single instance is insufficient and that there is no pattern of constitutional violations at the CCCC. However, this is simply untrue. There is in fact a disturbing pattern of excessive uses of force at the CCCC, especially by SRT officers. Only days before the use of force against Mr. Kaminski, another detainee was assaulted, pepper sprayed, and put into a restraint chair without justification. And these allegations are far from unfounded. The officers involved pled guilty to criminal charges for their actions. See *Chantelle Glass v. Idris-Farid Clark, et al*., No. CV-19-917942, Cuyahoga County Ct. Com. Pl.; *Ohio v. Robert P. Marsh*, No. CR-19-638832-B,

Cuyahoga County Ct. Com. Pl.; *Ohio v. Idris-Farid Clark*, No. CR-19-638832-A, CR-19-643484-A, CR-19-643485-A, CR-19-645264-A, Cuyahoga County Ct. Com. Pl. Only weeks before that instance, a detainee was punched in the face, kicked, and pepper sprayed, then put in a restraint chair after refusing to get off the phone, a completely non-threatening and only minorly disruptive failure to follow orders. After he was restrained, he was taken onto the elevator, where the beating continued off-camera. See *Cortez Tyree v. Cuyahoga County, et al*., No. 1-19-cv-1533 (USDC N.D. Ohio). And prior to these, there are even more examples of SRT officers violating detainees' constitutional rights, in very similar ways to that experienced by Kaminski. See Statement of Facts, p. 3, smashing detainee's face into floor hard enough to knock out teeth (Castleberry, Roarty-Nugent), beaten unconscious (Bean), pepper-sprayed without cause (Glaze, Castleberry, Roarty-Nugent, Bean), placed in restraint chair without cause (Glaze, Castleberry, Roarty-Nugent, Bean). The use of force by Defendants Jecubic and Barthany are not aberrations, but rather the norm at the CCCC. Officers, especially SRT officers, regularly use force without justification, including violent takedowns, using force past any reasonable point (to the point of unconsciousness), and using pepper spray without justification (and at close range). In addition, force is regularly used in retaliation for valid requests and complaints and for minor infractions. See Statement of Facts, p. 3, Glaze (force used in retaliation for asking about his release), Castleberry (force used in retaliation for complaining about stale bologna sandwich), Roarty-Nugent (force used in retaliation for perceived disrespect), Tyree (force used in retaliation for minor, non-threatening failure to follow order to end phone call), Glass (force used in retaliation for asking for a phone call).

These instances are sufficiently widespread to establish constructive notice by Defendant County. "[T]he sheer numerosity of incidents can provide evidence of constructive knowledge." *Alphabet v. City of Cleveland*, No. 1:05-cv-1792, 2006 WL 3241785, *14 (N.D. Ohio Nov. 7

19

2006), citing *Pineda v. City of Houston*, 291 F.3d 325, 330 n. 13 (5th Cir. 2002); accord *Leach*, 891 F.2d at 1247 (concluding that the plaintiff's proffer of evidence of 14 other similar incidents of unconstitutional behavior over two years put the sheriff on notice the plaintiff would be subject to constitutional deprivation). This is because "constructive knowledge may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of [their] official responsibilities the [municipal policymakers] should have known of them." *Id*. citing *Hernandez v. Borough of Palisades Park Police Dept*., 58 F.App'x 909, 913 (3d Cir. 2003). Here, there are at least 11 similar incidents, just in the year 2018. See Statement of Facts, pp. 3-4. And it is clear that the municipality was *not* properly exercising its official responsibilities. Official Cuyahoga County policy required that officers involved in a use of force omit critical details from their reports, including any resulting injuries. (Doc. 53, Muhammad, PageID#1196, 1201; Doc. 52, Kelley, PageID#984; Doc. 48, King, PageID#375). Without this information, the County maintains plausible deniability as to the severity of the uses of force regularly engaged in by its officers. A corrections officer using a proper arm bar technique to take a detainee to the ground, and a corrections officer using an improper technique to force the detainee to the ground with such force that teeth are knocked out or bones are broken are very different degrees of force, but this policy ensures that the documentation is indistinguishable. The documentation practices at the CCCC are insufficient and demonstrate collusion. (Doc. 68-2, Raney Report, PageID#2007). This practice of avoiding knowledge of excessive force is pervasive, with not only corrections officers, but also supervisors, choosing to stay intentionally in the dark about possible uses of excessive force at the CCCC. (See e.g. Doc. 52, Kelley, PageID#1024, 1026). There is also evidence that officials at the CCCC discount the reports of detainees as a matter of course. (*Id*., PageID#1020-1021, 1023, 1027).

The failure to act in light of pervasive acts of excessive force confirms the existence of a policy of tolerance of illegal brutality. Defendant County took no action when faced with evidence of excessive force and brutality by its SRT officers. There has been no communication within the chain of command about the multiple uses of force that have resulted in criminal charges. (Doc. 52, Kelley, PageID#1302). Nor has there been any action taken in response to the Marshals' report, which documented aggressive and abusive treatment of detainees by SRT members. (Doc. 53, Muhammad, PageID#1219-1221). And when the incident at bar was brought to the attention of Warden Ivey, he took no action. There was no investigation, much less any discipline for the officers involved. See Statement of Facts, p. 9. The failure to investigate an incident can be evidence of deliberate indifference. *Meirs v. Ottawa County*, 821 F.App'x 445, 453 (6th Cir. 2020), citing *Marchese v. Lucas*, 758 F.2d 181, 184 (6th Cir. 1985) (failure to investigate "served to confirm the existence of an unstated 'policy' of toleration of illegal brutality"). The investigation practices at the CCCC were "effectively non-existent." (Doc. 68-2, Raney Report, PageID#2016).

"The customs and practices in the CCCC… do not show individualized errors, but rather a widespread and systemic failure." (Doc. 68-2, Raney Report, PageID#2014). "When an agency fails to uphold reporting, supervision and review practices for the use of force, it is virtually inevitable that excessive force will occur but go undetected and unchecked." (*Id*.). Because this policy of tolerance of unconstitutionally excessive uses of force was well established in 2018, when Defendant SRT officers Jecubic and Barthany used excessive force on Kaminski, it was the moving force behind the violation of Mr. Kaminski's rights. Because Defendants Jecubic and Barthany acted in accordance with that policy, Defendant Cuyahoga County is liable for that unconstitutional use of force, and the municipal claim against Defendant County must be denied.

21

**D. Inadequate Training and Supervision Caused the Individual Defendants to Use Excessive Force Against Greg Kaminski**

The training provided by Defendant Cuyahoga County to Defendants Jecubic and Barthany also caused their use of excessive force. "To succeed on a failure to train or supervise claim, the plaintiff must prove that: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "When determining whether a municipality has adequately trained its employees, 'the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Jackson*, 925 F.3d at 834 (quoting *City of Canton*, 489 U.S. at 390). The deliberate indifference prong can be met by showing that the municipality failed "to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." *Ellis*, at 700-701. The deliberate indifference prong will also be met "where the city fails to act in response to repeated complaints of constitutional violations by its officers." *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999).

The training provided by Defendant Cuyahoga County is inadequate in light of the foreseeable consequences that would result from the instruction provided. The only training SRT officers receive is their OPOTA training and a one-time, two-week training when they are promoted to their SRT position. (Doc. 53, Muhammad, PageID#1150, 1176; Doc. 52, Kelley, PageID#927). The frequency and duration of use of force training failed to meet generally accepted correctional practices. (Doc. 68-2, Raney Report, PageID#2015). There is no testing required to pass. (Doc. 53, Muhammad, PageID#1174). This is inadequate to ensure that officers have learned what is necessary to use force without committing constitutional violations.

Additionally, it is clear that the County is completely indifferent to the adequacy of the

training provided. Defendant County has not taken any action to ensure that the use of force training is in compliance with Ohio standards, (*Id.*, PageID#1126-1127), and the two-week SRT training has not changed since the year 2000, except for the addition of pepper ball training. (Doc. 52, Kelley, PageID#949-950). The County engages in absolutely no oversight in what is taught. While the warden is ostensibly in charge of approving training, the only thing he reviews is the schedule. (*Id.*, PageID#955, 957). There is no guidance, learning objectives, or requirements of what to cover in the SRT training, and the instructors are not required to submit any written materials, including lesson plans. (*Id.*, PageID#952; Doc. 53, Muhammad, PageID#1156). There is no meaningful oversight of training at all.

As a result, it is not surprising that the content of the training itself is inadequate to ensure that officers understand the constitutional limitations on force. While the training discusses *Graham v. Connor*, 490 U.S. 386 (1989), which established the objective standard for using force, they are not actually trained that the standard is objective. The only thing they are told about *Graham* is that the standard is from the officer's perspective and that there is no 20/20 hindsight allowed. (Doc. 53, Muhammad, PageID#1143). Without the context of the objectiveness of the standard, this would reasonably lead officers to believe that the standard is subjective and that so long as they felt justified in the moment, that their actions will not be subject to review after the fact. It is foreseeable that this would lead to officers using excessive force in a broader range of circumstances than that permitted by the Constitution. The County was unable to say if it trained officers not to use pepper spray when a detainee was merely mouthing off. (*Id.*, PageID#1137). In *Wright*, the Sixth Circuit found the use of force training of the City of Euclid was inadequate to the tasks performed, where the training essentially consisted of reading the use of force policy at the officers, some practical training exercises that never changed, and that did not evaluate the

officers' performance. 962 F.3d at 882. The training here is inadequate for similar reasons.

Defendant County's only argument that it is not liable based on inadequate training is that the individual Defendants did receive training. This merely demonstrates a dispute of fact. While they did receive some use of force training, that is not conclusive as to adequacy.

The training provided by Defendant Cuyahoga County was the moving force behind the violation of Mr. Kaminski's constitutional rights. It is clear that the inadequacy was closely related to or actually caused the injury. Defendants Jecubic and Barthany were not trained to limit their uses of force to objectively reasonable ones, and may not have been trained that mouthing off was an inadequate justification for the use of pepper spray. Moving force causation is a question of fact for the jury. *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988); *Oklahoma v. Tuttle*, 471 U.S. 808, 833 n. 9 (1985) (Brennan, J., concurring); *Powers v. Hamilton Cnty. Public Defender*, 501 F.3d 592, 608 (6th Cir. 2007). Defendant Cuyahoga County's motion for summary judgment must be denied and Plaintiff's municipal claims must proceed to trial.

## CONCLUSION

For all the reasons stated above, Plaintiff asks the Court to deny Defendant Cuyahoga County's motion for summary judgment and to permit this case to proceed to trial.

Respectfully Submitted,

*/s/ M. Caroline Hyatt*
Sarah Gelsomino (0084340)
Marcus Sidoti (0077476)
FRIEDMAN, GILBERT + GERHARDSTEIN
50 Public Square, Suite 1900
Cleveland, OH 44113-2205
T: 216-241-1430
F: 216-621-0427
sarah@FGGfirm.com
marcus@FGGfirm.com

Jacqueline Greene (0092733)

M. Caroline Hyatt (0093323)
FRIEDMAN, GILBERT + GERHARDSTEIN
441 Vine Street, Suite 3400
Cincinnati, Ohio 45202
T: 513-572-4200
F: 216-621-0427
jacqueline@FGGfirm.com
caroline@FGGfirm.com

BRIAN KRAIG, ESQ. (0039691)
KEVIN V. ROGERS, JR. (0084994)
OF: KRAIG & KRAIG
The Superior Building 19th Floor
815 Superior Avenue East, Suite 1920
Cleveland, Ohio 44114
(216) 696-4009 phone
(216) 696-1835 fax
kraigandkraig@gmail.com
kvrlaw@gmail.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 17, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ M. Caroline Hyatt*
M. Caroline Hyatt
*Attorney for Plaintiff*

## CERTIFICATE OF COMPLIANCE WITH L.R. 7.1(f)

This Court modified the page limit for this memorandum to 24 pages. This memorandum, excluding this certificate, the certificate of service, and the signature block, is less than twenty-four (24) pages long and thus complies with L.R. 7.1(f) as a standard track case.

*/s/ M. Caroline Hyatt*
M. Caroline Hyatt
*Attorney for Plaintiff*